# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SIMON PROPERTY GROUP, L.P., on behalf of itself and affiliated landlord entities, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | C.A. No. N21C-01-204 MMJ (CCLD) |
| v. | ) ) | |
| REGAL ENTERTAINMENT GROUP, HOYTS CINEMAS CORPORATION, and WALLACE THEATER HOLDINGS, INC., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

Submitted: May 16, 2022
Decided: June 27, 2022

On Plaintiff's Motion for Partial Summary Judgment as to Liability
**GRANTED**

Timothy R. Dudderar, Esq., Jesse L. Noa, Esq., Carla M. Jones, Esq., Potter Anderson & Corroon, LLP, Wilmington, DE, David M. Fedder, Esq., Dentons US LLP, St. Louis, MO, Shannon Shin, Esq. (Argued), Dentons US LLP, Chicago, IL, *Attorneys for Plaintiff Simon Property Group, L.P.*

Kashif I. Chowdhry, Esq., Parkowski, Guerke & Swayze, P.A., Dover, DE, Curtis Romig, Esq. (Argued), Kevin Arocha, Esq., Bryan Cave Leighton Paisner LLP, Atlanta, GA, Erin A. Kelly, Esq., Bryan Cave Leighton Paisner LLP, Denver, CO, *Attorneys for Defendant Regal Entertainment Group, et al.*

## OPINION

**JOHNSTON, J.**

### FACTUAL AND PROCEDURAL CONTEXT

This case stems from leasing arrangements disrupted by the Covid-19 Pandemic.

The landlord is Simon Property Group L.P. ("Simon"), a Delaware limited partnership. Simon is the principal operating partnership for Simon Property Group Inc., a publicly-held Delaware corporation. Simon brings this action on behalf of itself and as an assignee of its affiliated landlord entities ("Simon Landlords").

Regal Entertainment Group is the parent company of several entities ("Tenants") that are tenants at various Simon properties. Hoyt Cinemas Corporation and Wallace Theater Holdings are subsidiaries of Regal Entertainment Group. Defendants, Regal Entertainment Group, Hoyt Cinemas Corporation, and Wallace Theater Holdings (collectively "Regal") are Delaware corporations.

This action involves four commercial lease agreements ("Leases") between Simon and Regal—Cape Cod Mall in Massachusetts, Coconut Point in Florida, McCain Mall in Arkansas, and Shops at Nanuet in New York. The Leases were

entered into between March 1999[1] and July 2012.  Each Lease is subject to a

choice-of-law provision.

Each Lease requires Tenants to timely pay their obligations as outlined

within the rental agreements.  Regal guaranteed performance by Tenants of all

agreements, covenants, and obligations contained within the Leases.  Each Lease

contains either the same or a close variation of the following Guarantee Provision:

> Guarantor hereby absolutely unconditionally and irrevocably guarantees (i) the full and prompt payment of rent and other charges payable under the Lease, (ii) the full, complete and punctual performance, observance and satisfaction of each obligation, duty, covenant and agreement of Tenant under the Lease, and (iii) the full and prompt payment of any costs of enforcing this Guaranty . . . . If Tenant defaults under the Lease, Guarantor will immediately cure the default, including payment to Landlord of any amounts in default, and including all damages and expenses arising in connection with Tenant's default, to the extent such are required to be paid by Tenant pursuant to the Lease.
>
> The Leases also contain a *force majeure* provision, obligating Tenants to pay

rent in full and on time despite the occurrence of a *force majeure* event.  Each

*force majeure* clause provides either the same or a similar variation of the

following:

> Section 21.5. Force Majeure. If either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure material, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, environmental remediation work

---

[1] The Cape Cod Lease was executed in March 1999, but operates under an amendment executed in January 2020.

3

whether ordered by any governmental body or voluntarily initiated, or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under this Lease, the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing, the provisions of this Section 21. 5 shall at no time operate to excuse Landlord or Tenant from the payment of Minimum Annual Rent, additional rent or any other payments required by the terms of this Lease when the same are due, and all such amounts shall be paid when due.[2]

In March 2020, state and local governments began to implement numerous orders and guidelines in response to the outbreak of COVID-19 in the United States. As a result, multiple states, including the states where the Simon properties are located—Massachusetts, Florida, Arkansas, and New York—mandated the closure of shopping malls and movie theatres. [3] Tenants at Simon properties adhered to the relevant COVID-19 restrictions in their respective states. In April 2020, Tenants began to default on their rent obligations under the Leases.

Upon reopening, capacity was restricted to 50% or less while adhering to social distancing guidelines. Additionally, movie studios had limited access to first-run films. Regal asserts there were no new releases from mid-March 2020 until at least August 2020. Regal began attempting to reopen theaters in August

---

[2] Affidavit of Jeffrey M. Clifton ("Clifton Aff.") Ex. F § 21.5.
[3] Defendants present numerous examples of government regulations. The Governor of Massachusetts issued a Shelter-At-Home order beginning March 24, 2020. The Governor of Florida declared a Stay-At-Home order effective April 3, 2020. Around March 18, the Arkansas Department of Public Health closed all indoor entertainment venues, including movie theaters. On March 7, 2020, the Governor of New York declared a disaster emergency. On March 22, 2020, the Governor of New York issues an Executive Order requiring all non-essential businesses to close.

2020 with limited access to first-run films.  As a result, Regal asserts that it was struggling to avoid bankruptcy due to non-existent revenue and high operating costs.

Tenants currently are in default under their Leases for failure to pay rent and other charges for the period between March 2020 and April 2021.  Simon asserts that Regal, as guarantor, owes Simon Landlords an excess of $5.5 million in unpaid rent and other charges.

Simon has moved for partial summary judgment on Count II (Breach of Cape Cod Regal Guaranty), Count III (Breach of Coconut Point Guaranty), Count IV (Breach of McCain Mall Guaranty), and Count V (Breach of Shops at Nanuet Guaranty).

## **MOTION FOR SUMMARY JUDGMENT STANDARD**

Summary judgment is granted only if the moving party establishes that there are no genuine issues of material fact in dispute and judgment may be granted as a matter of law.[4]  All facts are viewed in a light most favorable to the non-moving party.[5]  Summary judgment may not be granted if the record indicates that a material fact is in dispute, or if there is a need to clarify the application of law to the specific circumstances.[6]  When the facts permit a reasonable person to draw

---

[4] Super. Ct. Civ. R. 56(c).
[5] *Burkhart v. Davies*, 602 A.2d 56, 58–59 (Del.).
[6] Super. Ct. Civ. R. 56(c).

only one inference, the question becomes one for decision as a matter of law.[7] If the non-moving party bears the burden of proof at trial, yet "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment may be granted against that party.[8]

## ANALYSIS

The primary issue is whether the COVID-19 pandemic is an event excusing payment under the Leases. Each Lease contains a *force majeure* provision. The Cape Cod *force majeure* clause provides:

> The period of time during which either party is prevented or delayed in any performance or the making of any improvements or repairs or fulfilling any obligation under this Lease, other than the payment of fixed annual minimum rent, additional rent, percentage rent or any other required payment, due to unavoidable delays caused by fire, catastrophe, strikes or labor trouble, civil commotion, Acts of God or the public enemy, governmental prohibitions or regulations or inability to obtain materials by reason thereof, or any other causes beyond such party's reasonable control, shall be added to such party's time for performance, and such party shall have no liability reason thereof.[9]

The Coconut Point *force majeure clause* provides:

> If either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure material failure of power, restrictive governmental laws or regulations, riots, insurrection, war, environmental remediation work whether ordered by any governmental body or voluntarily initiated, or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under this Lease, the period for the performance of such act shall be

---

[7] *Wooten v. Kiger*, 226 A.2d 238, 239 (Del.).
[8] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[9] Clifton Aff. Ex. E § 23.04.

6

extended for a period equivalent to the period of such delay. Notwithstanding the foregoing, the provisions of this Section 21.5 shall at no time operate to excuse Landlord or Tenant from the payment of Minimum Annual Rent, additional rent or any other payments required by the terms of this Lease when the same are due, and all such amounts shall be paid when due.[10]

Both the McCain Mall and Shops at Nanuet *force majeure* clauses provide:

**"Force Majeure Event"** means any matter beyond the reasonable control and not the fault of LANDLORD or TENANT as the case may be, including, but not limited to, interference by governmental authorities civil disturbance, strikes, lockouts, labor disputes, inability to procure labor or materials failure of electric power, restrictive governmental laws or regulations, governmental intervention, taking by eminent domain, riots, insurrection, war, fire, casualty, severe weather, acts of terrorism, and acts of God, subject to the provision that such party's lack of funds or the unavailability of a particular contractor or personnel shall not be deemed a Force Majeure Event.[11]

\*\*\*

In the event that either party here to shall be delayed or hindered in or prevented from the performance of any act required hereunder (*except for the payment when due of any money*) by reason of a Force Majeure Event (defined in Section 1.03(d)), then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay, if the party claiming entitlement to the extension shall have provided written notice to the other party of the event giving rise to the delay within ten (10) Business Days of the occurrence of such event, but without such requisite notice being provided, no extension shall be applicable. Delays or failures to perform resulting from lack of funds or the unavailability of a particular contractor or personnel shall not be deemed delays by reason of a Force Majeure Event (defined in Section 1.03(d)).[12]

---

[10] Clifton Aff. Ex. F § 21.5.
[11] Clifton Aff. Ex. G § 1.03(d);  Clifton Aff. Ex. H § 1.03(d).
[12] Clifton Aff. Ex. G § 23.06; Clifton Aff. Ex. H § 23.06.

Simon relies on *Simon Property Group, L.P. v. Brighton Collectibles, LLC,* in which this Court found that the COVID-19 pandemic is not an event that excused payments under the lease.[13]  The *Brighton* lease provided:

> If either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure material, failure of power, **restrictive governmental laws or regulations**, riots, insurrection, war, environmental remediation work whether ordered by any governmental body or voluntarily initiated or **other reason of a like nature not the fault of the party delayed in performing work or doing acts required under this Lease**, the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing, the provisions of this Section 24.5 shall at no time operate to excuse Tenant from … any obligations for payment of Minimum Annual Rent, Percentage Rent, additional rent or any other payments required by the terms of this Lease  when the same are due, and all such amounts shall be paid when due.[14]

This Court dismissed the defenses of frustration of purpose, impossibility, impracticability, and breach of quiet enjoyment, holding that the *Brighton* leases contained a broad *force majeure* provision.[15]  The *Brighton* case survived the motion to dismiss solely on the issue of oral modification of the leases.

Simon argues that courts across the country consistently have held commercial Tenants to payment obligations despite the COVID-19 pandemic.  In *Brighton*, this Court relied on *1600 Walnut Corporation v. Cole Haan Company*

---

[13] 2021 WL 6058522, at *2 (Del. Super.).
[14] *Id*. at *6 (emphasis added).
[15] *Id*. at *7.

*Store.*[16]  In *Cole Haan*, the United States District Court for the Eastern District of Pennsylvania categorized the COVID-19 pandemic and resulting government restrictions as a *force majeure* event.  The District Court found that *Cole Haan* was still obligated to pay rent under the lease.[17]  The District Court reasoned that the *Cole Haan* parties had broad discretion to allocate risks between them in a contract.[18]

The parties in this action currently have a related case in Indiana.[19]  Regal's affiliated entities argued that their payment obligations were excused by the COVID-19 pandemic and related governmental restrictions.  The Indiana Commercial Court issued an order granting Simon's motion for summary judgement as to liability holding that the language of the Leases is "clear and unambiguous that those abatement clauses do not overcome [the *force majeure* provisions] which require the Defendants to pay rent on time despite any force majeure events."[20]  The court allowed the defense of impossibility to remain solely to be addressed as it pertains to determining damages. [21]

---

[16] 530 F.Supp.3d 555 (E.D. Pa.).
[17] *Id.* at 558.
[18] *Id.*
[19] *Simon Property Group, L.P. v Regal Cinemas, Inc.*, No. 49DOI-2102-Pl-005202 (Ind. Super. Ct. Feb. 18, 2022).
[20] *Id.*, slip op. at 15.
[21] *Id.*, slip op. at 12.

The Leases in this action contain choice-of-law provisions. The governing laws are respectively Tennessee, Arkansas, New York and Indiana. Simon asserts that the laws of each jurisdiction are not in conflict.[22] Regal does not provide authority to the contrary that is directly on point with this COVID-19 pandemic-based litigation.

Defendants primarily rely on *UMNV 205-207 Newbury, LLC v. Caffé Nero Americas Incorporated*.[23] The *Caffé Nero* court held: "*Caffé Nero's* obligation to pay rent was discharged while it was barred from letting customers drink or eat inside the leased premises, at least from March 24 to June 22, 2020."[24] The *Caffé Nero* lease provided that *Café Nero* could only use the premises as a café and in a manner consistent with other locations in the area. The *Caffé Nero force majeure* clause provided:

> Neither the Landlord nor the Tenant shall be liable for failure to perform any obligation under this Lease, except for the payment of money, **in the event it is prevented from so performing by** ... order or regulation of or by any governmental authority ... or for **any** other **cause beyond its reasonable control**, but financial inability shall never be deemed to be a cause beyond a party's reasonable control ..., and in no event shall either party be excused or

---

[22] For example, in *A/R Retail LLC v. Hugo Boss Retail, Inc*., the New York Supreme Court opined: "A number of New York courts assessing commercial lease disputes amidst the COVID-19 pandemic have held that the temporary and evolving restrictions on a commercial tenant's business wrought by the public health emergency do not warrant rescission or other relief based on "frustration of purpose." 2021 WL 2020879, at *9 (N.Y. Sup. Ct.).

[23] 2021 WL 956069 (Mass. Super.).

[24] *Id.* at *1.

10

delayed in the payment of any money due under this Lease by reason of any of the foregoing.[25]

The court allowed the frustration of purpose defense to survive, finding that there were no other provisions in the lease that addressed the possibility of frustration of purpose or allocating the risk of a global pandemic leading to operating restrictions.[26] The court reasoned:

> This *force majeure* provision says that generally neither UMNV nor Caffé Nero is liable for breach of contract if they are prevented from performing by any cause beyond its reasonable control, but it includes two important exceptions. First, financial inability shall never be considered a cause beyond a party's control. Second, failure to pay rent or other money due under the Lease will never be excused on the ground that a party was prevented from making the payment by some cause beyond its control. The phrase "by reason of any of the foregoing" at the end of the provision refers to a party being "**prevented from ... performing** by" any of the listed risks or any other "cause beyond its reasonable control."
>
> Thus, the *force majeure* provision addresses the risk that performance may become impossible, but does **not** address the distinct risk that the performance could still be possible even while main purpose of the Lease is frustrated by events not in the parties' control.[27]

The court further reasoned that the *Caffé Nero* lease, as a whole, provided confirmation that the *force majeure* provision did not address possible frustration

---

[25] *Id.* at *6.

[26] *Id.*

[27] *Id.* (emphasis in the original).

11

of purpose.[28]  There were separate provisions in the lease that addressed the classic

cause of frustration of purpose and *Caffé Nero's* rights under the doctrine.[29]

> [N]othing in [the *force majeure* provision] says that [provisions
> specifying how frustration of purpose would apply] is an exception to
> the *force majeure* rules that the parties negotiated. Because it is not;
> frustration of purpose is a different issue, arises under different
> circumstances, and is not addressed by the *force majeure* provision.[30]

The holding in *Caffé Nero* is distinguishable and unpersuasive.  The Court

finds that the *force majeure* clauses in the Leases are substantively similar to the

leases in *Brighton* and *Cole Haan*.  There has been no argument that there are

separate clauses in the Leases that address allocation of risk for frustration of

purpose.  The Leases are not ambiguous regarding the *force majeure* provisions.

The provisions very broadly allocate the risk of unforeseeable events.  There is no

authority presented or basis to find that a *force majeure* provision must list every

possible event or circumstance that may excuse performance under the Lease.  The

Leases unambiguously and clearly allocate risk of impossibility and

impracticability to Tenants.

The Court further finds that there is no conflict regarding a choice of law

analysis.  Therefore, based on the great weight of authority in Delaware and other

---

[28] *Id.*

[29] *Id.* at *7.

[30] *Id.*

12

jurisdictions, Simon is entitled to partial summary judgment on liability. The Court finds that the affirmative defenses set forth by Regal do not apply.

The Court acknowledges that this ruling may seem harsh. However, all parties to the Leases are sophisticated. The parties freely contracted and allocated risks. The parties chose to allocate *force majeure* risk to Tenants.

The events surrounding COVID-19, although unfortunate, are neither unprecedented nor unforeseeable. In the early 20th century, the world experienced one of the most severe pandemics—the Spanish Flu. In 1988, the film industry was significantly affected by the Writers Guild of America strike—halting the release of first-run movies.

For purposes of clarity the Court need not address the standing of Regal to assert the affirmative defenses of impossibility, impracticability, and frustration of purpose. The Court need not address the circumstances surrounding closures as they pertain to government restrictions. The Court further also need not address the lack of access first-run films; Simon's alleged breach of co-tenancy requirements under the lease;[31] and Simon's alleged breach of the Covenant of Quiet Enjoyment.

---

[31] The co-tenancy provision provides:
> (a) The "Co-Tenancy Obligation" means that . . . Landlord shall be required to have . . . (1) a minimum of two (2) anchor stores (each having no less than 50,000 square feet of floor space) occupied, open for business and in operation on a continuous basis; [and] (2) a minimum of seventy percent (70%) of the small shop . . . retail and restaurant units of the Center occupied, open for business and in

13

## CONCLUSION

The Court finds that the Leases contain broad *force majeure* provisions. These provisions allocate risk for unforeseeable events to the Tenants. Based on the great weight of authority in Delaware and in other jurisdictions, Regal is not excused from its obligations as Guarantor pursuant to the Leases. Thus, the doctrines of frustration of purpose, impossibility, impracticability, and breach of quiet enjoyment, cannot survive a motion to dismiss. **THEREFORE**, Plaintiff's Motion for Partial Summary Judgement as to Liability on Counts II, III, IV, and V is hereby **GRANTED**.

**IT IS SO ORDERED.**

*/s/ Mary M. Johnston*
The Honorable Mary M. Johnston

---

operation on a continuous basis[.] (b) A Deficient Occupancy Level shall exist if the Co-Tenancy Obligation is not met[.] (c) For each period of Deficient Occupancy Level . . . in complete substitution of Base Rent and Percentage Rent which otherwise would be payable, Tenant shall pay to Landlord as "Co-Tenancy Deficiency Rent" Fifteen Percent (15%) of Gross Sales during the Period of Deficient Occupancy Level[.]

The Court finds that even if the co-tenancy provision applies, it is applicable to damages, not liability.

14